we are ready to proceed uh... missed before i start the clock though mister toholly i don't know you've heard uh... my comments to prior counsel but you've reserved five at the end uh... all uh... interject uh... if i hear it here the tone that to just remind you uh... and uh... between the government and new corp course you can split it up any way you want but at the end of fifteen you'll have to wrap up everybody clear yes your honor thank you yes your honor okay yes your honor okay swell uh... mister holly let's get going good morning and may it please the court this case is about whether commerce's decision to resort to total adverse facts available a tool normally reserved for uncooperative respondents was a reasonable response to deacero's inadvertent fully corrected mistake mister holly mister holly let's start right there this is judge wallach uh... when uh... deacero submitted its revised cost database uh... to commerce it characterized the changes as minor corrections newcorp argues that an experienced respondent in anti-dumping proceedings uh... like deacero knows uh... is well aware that the phrase minor corrections is a term of art uh... and that commerce has explained they're not minor when they impact a large quantity of sales or have a significant impact on the margin do you agree minor correction is a term of art applicable here no your honor we don't believe that the term minor correction as newcorp refers to it is a term of art that applicable in these circumstances uh... minor correction is only a term of art in the narrow context of verification proceedings and all of the is it your position wait wait wait it's your position it's only applicable to on-site verification can you cite anything to support that the well the uh... the cases that newcorp uh... refers this court to in its brief uh... are all commerce decisions that relate to verification during an on-site verification uh... commerce commerce personnel visitor wait wait wait wait i didn't ask you what they cited has commerce ever drawn you're obviously not going to cite me to anything has commerce ever drawn this distinction between verification and unsolicited supplemental questionnaire responses commerce is no they haven't uh... specifically drawn this distinction but it would make no sense for commerce to apply is there a substantive difference between the two contexts yes there is so during the verification proceeding uh... commerce has completed fact-gathering phase of the review and uh... they're just looking to confirm that the data that respondent previously provided is accurate and as respondent says it is so in that context no factual information that mister holly that's not true uh... they haven't completed their fact-gathering uh... they can continue to gather facts is that not correct well they they can't accept uh... new factual information is what i meant so the question of whether or not something is a minor correction in the context of a verification uh... relates to whether or not that information rises to the the level of new factual information uh... well hang on then is it fair to characterize the changes in dsrl's substantially revised cost database as minor corrections yes so dsrl uh... when it used the term minor correction was referring to the nature of the error and what it had to do to correct uh... to correct its mistake so to be clear right but the total universe of cost that dsrl reported didn't change between uh... the initial data set and the revised data set the only thing that changed was the allocation of one specific type of cost the steel scrap cost uh... to particular quantum numbers so in light of that uh... yes dsrl reasonably believed that that was a minor correction on on page thirty seven of its red brief uh... new court notes that before commerce uh... were you dsrl's council there uh... no your honor i was not uh... dsrl's council before it notes that dsrl acknowledged that it did not initially provide commerce with a complete explanation uh... that the one sentence statement accompanying its substantial revisions to its cost database this is unquotable was a more general answer or explanation uh... you didn't mention that concession in your in your brief why not yes so if you look at the context of that statement dsrl's former council did not concede that dsrl did not provide a complete explanation uh... specifically if you look at the transcript from that hearing uh... at and i'm referring to appendix pages fifty five fifty three and fifty five fifty four it's clear that council's statement was a response to new court's arguments immediately prior that the july twenty sixteen correction was unexplained so dsrl's council at the time clarified that the initial submission in july twenty sixteen uh... with not entirely unexplained but rather that that initial explanation with more general and that the additional explanation in the post-preliminary submission quote complete so in that context uh... it's clear that the term complete wasn't a concession that the initial response had been incomplete it was just it was used as a synonym for more details in that case uh... okay on page seven of its red brief uh... new court states that uh... quote while you recognized your revised cost database was unsupported by contemporaneous business documents and reconciliations you chose instead to rely on the quote one sentence explanation in your first supplemental questionnaire did you ever provide any contemporaneous business documents or reconciliations to support or explain your revised cost database and where are they in the record so what dsrl provided uh... was responsive to exactly what commerce asked and uh... again in the in the post-preliminary phase commerce asked dsrl for the first time to explain specifically why the cost associated with a particular quantum number had changed and to provide a so-called quantum cost buildup yes dsrl did provide that quantum cost buildup which linked the cost of that particular product code that quantum uh... back to its revised data set and so that that buildup in other words indicated that um... all of dsrl's product specific costs could be traced back to its section d data set on page five of the gray brief you say that the record quote illustrates only that dsrl made an error in its cost database voluntarily submitted a corrected database and subsequently provided a full explanation of the nature of the corrections as well as other supporting evidence uh... supporting information requested by commerce how were dsrl's actions voluntary when it didn't offer any meaningful explanation of its revised cost database until after nucor brought the revisions to commerce's attention dsrl's actions were voluntary in the sense that uh... commerce has not provided any sort of guidance for uh... when parties are supposed to submit corrections if they find them and how the parties are supposed to make those corrections so dsrl in this case proactively i'm sorry your honor i said of course it is provided guidance there's there are points at which you can no longer provide corrections yes that that's correct but um... that has to do with how close the corrections are to the deadline for the preliminary results and in this case uh... dsrl's revisions were submitted months in advance of the preliminary results stage and they were corrections to its own initial submissions so dsrl uh... it acted proactively and it took the initiative here to as soon as it recognized this mistake to correct the mistake and to provide commerce with all of the information that it needed to uh... not only calculate dsrl's dumping margin but if it wanted to to review the significance of the revision so dsrl provided for example a list of the specific data fields that had changed so that commerce could verify uh... exactly what the revisions were and commerce of course had the initial cost database uh... counsel on page uh... thirty to thirty i'm i'm going to continue with this question uh... of its brief the government asserts that your argument that it was contrary to law for commerce to resort to facts available because the revised cost database was usable is waived because it was only raised before the CIT in a perfunctory manner where did you argue that this point before the CIT in the record uh... so on that point uh... i would i would direct this court to dsrl's uh... opening opening brief uh... before the CIT yeah give me a page uh... yes one  okay your honor uh... so uh... if we uh... turn it's at the uh... at the very end of the appendix just give me a page so i can go look at it okay you want to do that in what uh... responsive time you have left uh... yes your honor of course i'm i'm happy to address this fully uh... in in the rebuttal phase okay uh... i'm gonna uh... ask my brethren if they have any questions since this is the last case we can okay uh... then let's hear from the government thank you your honor uh... on behalf the united states uh... commerce's determination to apply total adverse facts available here is supported by substantial evidence uh... the initial questionnaire from commerce specifically asked uh... the parties to provide their actual costs and it also said that if the party did not track actual costs uh... it asked for a series of uh... databases and information uh... describing the way that the company actually tracked their costs in response to that questionnaire in february of twenty sixteen de ferro stated on no fewer than four occasions in that questionnaire response that the cost database that was submitting were based on actual costs and for the court's reference that's appendix page one seventeen appendix page one forty eight appendix page one forty nine and appendix page one fifty uh... and in addition to uh... indicating that it had it was providing actual costs uh... in response to the question about cost variances if you don't track actual costs uh... de ferro responded there's no need for us to answer this question we are providing you actual costs uh... it wasn't until july of twenty sixteen so uh... several months later that de ferro uh... provided the updated cost of production database the only explanation that de ferro accompanied with that database uh... as the court has noted was uh... three sentences essentially saying that these are minor corrections made to the sales and cost database and then two sentences saying we've corrected the assignment of steel scraps uh... and a statement about the fields uh... that were impacted by this uh... that would be entirety of the response from de ferro uh... i think it bears noting that in response to another supplemental questionnaire again not specifically about the cost database but something unrelated uh... de ferro in september twenty sixteen noted that nucor had flagged the distinct differences between the two databases that had been submitted uh... and acknowledged that uh... nucor's argument that they had failed to explain the the scope of the differences and uh... in their response uh... essentially say to the contrary we did respond and then repeated just those same two sentences again and that appears on appendix page five five zero one uh... commerce issued a post preliminary supplemental questionnaire uh... right after the then uh... the response from de ferro was received on november twenty-fifth of that year and there for the very first time a full nine months after it had submitted its initial cost of production database de ferro indicated that that initial database notwithstanding the repeated statement that it was based on actual costs was in fact based on planned costs and that the secondary database was the one that was based on actual costs uh... and i'm quoting specifically here from the questionnaire response received by de ferro saying quote in other words steel scrap costs are now based on actual not planned production and that language is in the appendix at page nine hundred and fifteen based on this information commerce determined that the cost of production database and the cost and value database could not be used uh... contrary to the assertions made by de ferro in its opening and reply brief commerce's determination not to accept not to use the information was not because it was deemed to be untimely the database was submitted in july but rather it was because once the actual scope of difference between the two databases was uh... revealed for the very first time by de ferro a full nine months after it had been received uh... commerce determined that it could no longer rely on either of those databases and then made the second additional determination uh... that de ferro by virtue of evidently having at the very latest noticed the problems with this initial submission uh... in july had failed to fully explain the difference between those until uh... it had been given multiple opportunities to do so and then finally revealed them in november uh... and just just to briefly touch on a couple points raised in de ferro's reply brief uh... there there's an assertion that uh... commerce and that the government and the trial court are relying on post hoc statements of counsel as opposed to actual findings made by commerce with regard to uh... a failure to uh... to actually cooperate and and um... behave to the best of their ability uh... i would refer the court specifically to the IDM which is in the where commerce did actually in fact make a specific finding that de ferro had quote significantly impeded the proceeding by failing to identify the scope of the initial error in the initial database uh... and then not revealing the actual difference between the two databases until uh... after the post preliminary had been issued if there's no questions on that issue i will um... briefly touch on the corroboration so commerce uh... selected in accordance with commerce's uh... commerce's practice it's selected from among the highest rates um... the highest rate alleged in the petition or in the highest weighted average calculated rate for any respondent in the investigation and selecting from adverse facts available here it's selected a forty percent rate based on the petition in this matter and de ferro was uh... and uh... commerce was given the opportunity to on remand to further substantiate the selection of this rate and uh... in the remand redetermination commerce placed significant information on the record underlying uh... the rationality of its of its decision to use um... to use this information uh... specifically commerce placed on the record uh... the full information this is judge wallach i do have a question for you certainly does commerce use the term uh... minor correction they do your honor yes and commerce did not necessarily make a finding with regard to it being a term of art or not um... it is uh... as council for de ferro indicated it is a term that is used in verification it is also used in the context of responses and again commerce did note the use of that term and found that it was part of the reason for applying not because it's a term of art that they had technically used incorrectly but rather by explaining the updated database in july by just saying it's minor and providing two sentences explaining the differences it had not allowed commerce to appreciate the scope of the changes and had not afforded commerce an opportunity to further dig into the changes between the databases okay but it is certainly a term commerce uses thank you and so with regard to the corroboration commerce placed all of the information from the petition on the record in addition commerce placed a memorandum to file where talking about how commerce had interviewed the actual market researcher who had obtained the home market price quotes that were contained in the actual petition in addition to uh... ex parte memorandum to file in which commerce is interrogating the information that had been placed on the record by the petitioner discussing questions regarding affidavits and the foreign market research that was actually contained into supplement in addition to all of this information that was placed on the record commerce also took a look at transaction specific margins from the immediately preceding review and determined that a non-insignificant portion of them were and I can't use the number unfortunately your honor because it's CPI but a non-insignificant portion of them were either at or significantly several times higher than the 40% rate that commerce had determined and this is in accordance with statute 1677 E B2 specifically contemplates that the petition can be a source for adverse acts available rates 1677 EC says that commerce must corroborate it but says that it must be corroborated to the extent practicable so we would submit that the corroboration that is placed on the record by commerce in addition to the step of comparing the selected rate to the Sarah's margin margins on specific transactions in the immediately preceding review more than meets the requirements of the statute unless there are any questions from the panel I will yield the remainder of my time and requested the court to stay in the trial court determination thank you thank you counsel Mr. Holt good morning your honor may good morning your honor may it please the court I'm Derek Holt on behalf of Newport Corporation I would like to put the court's attention to two issues related to commerce's application of adverse inferences the first one is that while Nippon's best of visibility standard does not require findings of motivation or intent commerce did find that DSRO misrepresented and mischaracterized information that it provided to government agencies and that's at the appendix page 1032 and 1033 so you know while DSRO attempts to downplay commerce's actual findings you have substantial evidence that DSRO misrepresented the magnitude of the changes made to its database and mischaracterized the changes made to its database as much the second thing that I would like to point the court's attention to is that there is substantial evidence that the adverse inferences are warranted because DSRO wasn't forthcoming with this response as the government explained DSRO made substantial changes to the cost of the column that comprised the overwhelming vast majority of its USL and the exact figures are confidential but they're at Newport's brief at page 28 when you look at those figures you can see that the cost decline is significant and it is undisputed that DSRO at all times knew the reason why it allocated a significant portion of its cost away from the column in question DSRO had at least two opportunities prior to the preliminary determination to explain why commerce made to explain to commerce why it made these changes but chose not to do so so if you want to look at whether DSRO was forthcoming with its explanations I say you don't have to look any further to DSRO's former counsel who stated at commerce's hearing when we explained the correction initially we gave kind of a more general answer or explanation what they had and what they said with those three sentences was a general answer it was not a full and a complete answer last thing I would just say is that substantial evidence shows that DSRO was forthcoming wasn't forthcoming with its explanation or why it made the change in the first place and I'll ask the court to affirm commerce's determination and apply ASA and assign DSRO a margin of 40.52%. Thank you. Thank you and let's see Mr. Hawley you asked for rebuttal time and I ate up all your time so I'll give you a minute. Great thank you your honor and I did want to pick up and address the point regarding DSRO's argument that because commerce did use  it was obligated to explain why that data became unusable and I do want to mention the statutory provision that creates this obligation for commerce and that is at 19 USC section 1677 M subsection D and that requires commerce first of all to promptly inform a person submitting a response with a deficiency as to the nature of the deficiency but more importantly here it instructs commerce to and subsection E instructs commerce that it shall not decline to consider information that's submitted as long as it meets certain applicable requirements and one of those requirements is that the information can be used without undue difficulties. So to answer your question if you look at DSRO's opening brief before the CIT and this is at appendix 5537 and 5538 specifically it discusses it starts out by discussing of course that commerce found the specific reallocation of billet costs unreliable but it doesn't really explain why that means that all of the data DSRO provided is unusable and at the top of page 5538 DSRO argues finally given that commerce had no problem relying on the revisions to calculate a margin for the may be used without undue difficulties commerce had no reason not to rely on this information and erred in refusing to do so. So what the government refers to as this usability argument is really related to section 1677M and the requirement that commerce consider information even if there's some issues with it provided the information cannot be used or can be used without undue difficulties. Is that it counsel? Yes. That's our argument and again it's a statutory argument. It's based in commerce's obligations under 1677M. Okay. Thank you Mr. Hawley and I just comment as an aside that your argument reminds me of Prime Minister Churchill's naming in 1941 1940 of Operation Wilfrid. You might look it up. It was named Wilfrid because it was so minor and inoffensive. That was a cartoon character who had those characteristics. Thank you. The matter will stand submitted and that concludes cases for the day.